UNITED STATES of America, Appellee,

v.

**Marie V. CYR, Defendant, Appellant.**

**No. 82–1423.**

United States Court of Appeals,
First Circuit.

Argued May 5, 1983.

Decided July 27, 1983.

Raymond C. Malloy, Methuen, Mass., by appointment of the Court, for defendant, appellant.

Sara Criscitelli, Atty., Appellate Section, Crim. Div., Dept. of Justice, Washington, D.C., with whom William F. Weld, U.S. Atty., Boston, Mass., and Ernest S. Dinisco, Sp. Atty., Dept. of Justice, West Roxbury, Mass., were on brief, for appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and RE,* Chief Judge.

BOWNES, Circuit Judge.

Defendant-appellant, Marie V. Cyr, appeals her jury conviction on one count of conspiring to knowingly and willfully misapply bank funds in violation of 18 U.S.C. § 656[1] and 18 U.S.C. § 371[2] and ten substantive counts of aiding and abetting the misapplication of bank funds in violation of 18 U.S.C. § 656 and 18 U.S.C. § 2.[3]

Cyr, John F. Manning, Richard A. Brandolini, and Peter P. Kattar were tried together on the same charges. Manning was vice-president and installment loan officer in the consumer credit division of the Bay State National Bank. Kattar and Brandolini had been business associates of Cyr. Brandolini became ill during the trial and his case was severed without objection by the other defendants. The jury returned not guilty verdicts as to Manning and Kattar.

The issues can be stated as follows:

1. whether the inconsistent verdicts require a new trial;

2. whether the evidence was sufficient to sustain appellant's conviction;

3. whether the government's characterization of appellant in the indictment and at trial was unfair and prejudicial;

4. whether the district court's instructions to the jury were erroneous; and

5. whether there should have been a severance of defendants and/or counts.

---

* Hon. Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

1. 18 U.S.C. § 656 provides:

Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors, of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

As used in this section, the term "national bank" is synonymous with "national banking association"; "member bank" means and includes any national bank, state bank, or bank and trust company which has become a member of one of the Federal Reserve banks; and "insured bank" includes any bank, banking association, trust company, savings bank, or other banking institution, the deposits of which are insured by the Federal Deposit Insurance Corporation.

2. 18 U.S.C. § 371 provides in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

3. 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Before we review the evidence on which defendant's conviction was based, we think it helpful to set forth the applicable law. We start with the inconsistent verdicts.

Inconsistency in a verdict is not sufficient reason for setting it aside. We have so held with respect to inconsistency between verdicts on separate charges against one defendant, *Dunn v. United States,* 284 U.S. 390 [52 S.Ct. 189, 76 L.Ed. 356] (1932), and also with respect to verdicts that treat codefendants in a joint trial inconsistently, *United States v. Dotterweich,* 320 U.S. 277, 279 [64 S.Ct. 134, 135, 88 L.Ed. 48] (1943). *Harris v. Rivera,* 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981) (footnotes omitted); *see also Hamling v. United States,* 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974); *United States v. McQueeny,* 674 F.2d 109, 115 (1st Cir.1982); *United States v. Previte,* 648 F.2d 73, 80 (1st Cir.1981).

In *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), the Supreme Court held that an aider and abettor in the commission of a federal offense may be convicted, although the principal had been acquitted of the offense charged. The Court said: "With the enactment of that section [18 U.S.C. § 2], all participants in conduct violating a federal criminal statute are 'principals.' As such, they are punishable for their criminal conduct; the fate of other participants is irrelevant." *Id.* at 20, 100 S.Ct. at 2006 (footnote omitted).

■ It is axiomatic that an aiding and abetting conviction requires proof that the substantive crime has been committed. *United States v. Campa,* 679 F.2d 1006, 1013 (1st Cir.1982). It was necessary, therefore, for the government to prove that Manning, the acquitted loan officer, had willfully misapplied funds of the bank by which he was employed. *Giragosian v. United States,* 349 F.2d 166, 167 (1st Cir.1965).

■ We turn to the law on misapplication of bank funds. It is well established that "[a] reckless disregard by a bank official of his bank's interest is sufficient to establish the requisite intent to defraud."

*United States v. Larson,* 581 F.2d 664, 667 (7th Cir.1980) (citations omitted); *see United States v. Fusaro,* 708 F.2d 17 at 21 (1st Cir.1983); *United States v. Krepps,* 605 F.2d 101, 104–05 (3d Cir.1979); *see also United States v. Killian,* 541 F.2d 1156, 1159–60 (5th Cir.1976) (evil desire or motive to cause injury not required). It has also been consistently held that the probability of repayment is not legally significant. *United States v. Southers,* 583 F.2d 1302, 1305 (5th Cir.1978); *United States v. Foster,* 566 F.2d 1045, 1053 (5th Cir.1977), *cert. denied,* 435 U.S. 917, 98 S.Ct. 1473, 55 L.Ed.2d 509 (1978); *United States v. Tidwell,* 559 F.2d 262, 266–67 (5th Cir.1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978); *United States v. Acree,* 466 F.2d 1114, 1118 (10th Cir.1972), *cert. denied,* 410 U.S. 913, 93 S.Ct. 962, 35 L.Ed.2d 278 (1973); *Golden v. United States,* 318 F.2d 357, 361 (1st Cir.1963).

With these legal principles as a framework we review the evidence and all legitimate inferences to be drawn from it in the light most favorable to the government. *United States v. Winter,* 663 F.2d 1120, 1127 (1st Cir.1981).

The question on the conspiracy count conviction is whether there was sufficient evidence to establish a conspiracy between defendant and Manning (the bank official) or between defendant, Manning and Kattar to misapply bank funds. The conviction on the substantive counts requires two lines of inquiry: whether the evidence was sufficient to convict Manning, as principal, of misapplication of bank funds; and whether there was sufficient evidence to convict defendant of aiding and abetting Manning, 18 U.S.C. § 2(a), or of causing him to misapply bank funds, 18 U.S.C. § 2(b).

The facts center on the operation of the Cardinal Restaurant in Bradford, Massachusetts. The restaurant was acquired by Kattar and Brandolini in 1974. Defendant became involved in its management shortly after it was acquired and subsequently took over its ownership. Kattar and Brandolini

continued to be associated with the restaurant's operation.

Defendant had worked in her father's grocery business while she was growing up and as an adult had considerable success as a salesperson for Stanley Home Products. She did not, however, have any prior experience in the restaurant business.

Defendant envisioned a great future for the restaurant. Her dreams of success turned into an obsession. It soon became evident that the restaurant could not fulfill her hopes without money for refurbishment and alteration, as well as operating expenses. Defendant applied to the Bay State National Bank for commercial loans, but her applications were rejected. She then appealed to Manning, who was a family friend of many years.

As installment loan officer, Manning had authorization to make unsecured personal loans up to $10,000 without prior approval. Manning knew that defendant's commercial loan applications had been turned down but, nevertheless, approved personal loans to defendant, Kattar, and Brandolini and to friends and acquaintances of defendant. The proceeds of all or most of the loans went into defendant's restaurant business with Manning's full knowledge and tacit approval.

Despite this infusion of capital, the restaurant continued to flounder financially, and in November 1975 a Chapter XI Bankruptcy reorganization proceeding was instituted. Defendant was appointed temporary receiver and treasurer and was given six months, until April 1976, to get the restaurant on a solid financial footing.

Faced with this deadline defendant again turned to her friend Manning for approval of personal bank loans to third parties with the proceeds going to her for use in the restaurant. Defendant prevailed upon her employees, relatives, friends and acquaintances to take out personal bank loans as nominee borrowers. Some of the loans were obtained by promises of ownership shares in the restaurant and other borrowers received immediate cash payments of a small amount (a few hundred dollars) from the loan proceeds. A good number of borrowers succumbed to the blandishments and persuasiveness of defendant without receiving anything more than the promise made to all nominee borrowers—that they would not be responsible for repaying the loans.

The credit information necessary for the individual loan applications was embellished or falsified by defendants, Kattar, or Brandolini and forwarded to Manning. The nominee borrower was usually accompanied to the bank by either defendant, Kattar, or Brandolini. In most instances Manning, on the basis of the information already sent to him, would have the loan application filled out when the nominee borrower arrived at the bank so that all that was necessary was the borrower's signature. After the application was signed, the nominee borrower received a check, which was promptly endorsed and turned over to either defendant, Kattar, or Brandolini.

Manning knew that these loans were being used for defendant's restaurant business. There was a plethora of evidence from which it could be found that Manning knew that the great majority of the nominee borrowers had neither the intention nor the wherewithal to pay off the loans. Indeed, Manning was told by some nominee borrowers that the information on the loan application was false; he was told by other borrowers that they couldn't and wouldn't repay the loans.

When a nominee borrower received a notice from the bank that a loan was in default, he or she informed defendant, who assured them that their loans would be repaid by her or the restaurant. Defendant did make a determined effort to meet the loan obligations, but the restaurant was not doing enough business to make this possible. Defendant then took the next step; she arranged for new loans to pay off the old ones. Arrangements were also made with Manning to rewrite certain loans; in some instances, the nominee borrowers obtained additional loans in greater amounts than the original one.

The collapse of this house of cards began when Manning took his mandatory vacation in October 1977. An audit revealed that one hundred sixty-seven loans involving defendant, Kattar, Brandolini, and the Cardinal Restaurant totalling over one million dollars in unpaid principal and interest were outstanding. Defendant's response, when questioned by bank officials, illustrates how her fixation on running the restaurant completely divorced her from reality; she blamed the situation on the bank's refusal to grant her the loans she had originally requested. The Cardinal Restaurant closed in 1978. The bank lost $197,000 on the loans; the bulk of the loss was absorbed by the bonding company and the Federal Deposit Insurance Corporation.

We think it clear that the evidence established beyond a reasonable doubt that defendant and Manning conspired together to misapply bank funds in violation of 18 U.S.C. § 371. The scheme of using nominee borrowers to obtain money from a bank for use by one who cannot herself arrange for a formal loan comes within the misapplication of bank funds prohibited by 18 U.S.C. § 656. *United States v. Gens*, 493 F.2d 216, 222 (1st Cir. 1974). Nor can there be any doubt that there was sufficient evidence to have convicted Manning of the substantive offense. The facts proved a reckless disregard by Manning of his duties as a bank loan officer. Defendant argues that given sufficient time she could have repaid the loans and points out that Manning testified to this effect. But as we have already shown, the probability of repayment is of no legal consequence.

The evidence showing that defendant aided and abetted in the misapplication of the bank funds was overwhelming.

In the light of Manning's acquittal, we can understand defendant's feeling that she was treated unfairly. Although we now enter the realm of speculation, we think it appropriate to point out evidence that might explain the inconsistent verdicts. First of all, there was no evidence that Manning personally profited from the loans.

There was also testimony attesting to Manning's honesty and integrity. Defendant, on the other hand, was the one who obtained the proceeds of the loans. Although there was evidence that the money was used exclusively for the restaurant, there was also some evidence that some of the monies obtained from the bank might have been used by the defendant personally. Defendant testified that during the summer of 1977 she gambled regularly at the race track and won. Her estimate of winnings ranged from $100,885.80 to $76,000. A skeptical jury might well have thought that defendant overstated her winnings and used some of the bank loans for playing the horses. It was brought out on cross-examination that defendant opened another restaurant in 1980 or 1981. This suggests that even after the Cardinal debacle she had some money available for another venture.

There are two other items of evidence that might have influenced the jury. During her testimony, defendant admitted that she was responsible for Manning's downfall. She also stated that she failed to follow the advice of Kattar and Brandolini in operating the restaurant and that if she had done so, things might have been different. Finally, the government was allowed to introduce into evidence on the question of defendant's credibility the fact that she was convicted in New Hampshire of forgery of a check on February 2, 1980. We advert to this evidence only to show that the acquittal of Manning by the jury might have been prompted by more than mere whim or caprice, even though the reasons, or lack of them, for an acquittal cannot be questioned.

The rest of the issues need not long detain us. We find nothing to defendant's claim that the government unfairly portrayed her in the indictment as a central figure. The indictment does not state that she was the central figure; the evidence adduced at the trial, including her own testimony, established defendant as the central figure. Nor is there any merit to the claim that the government's characterization of her at the trial as the owner of the restaurant was unfair. It is true that the restau-

rant was owned by a corporation, Rick's of Haverhill, but defendant was its president and treasurer. Everyone who testified, including defendant herself, assumed that she owned the Cardinal Restaurant.

■ We have read the jury instructions carefully and can find no error. The instruction on the law of conspiracy was clearly correct. The court, after a bench request by defendant, amended its instruction on aiding and abetting to make it clear that before a finding of aiding and abetting could be made the jury "must be assured that [Manning] committed those acts both knowingly and with intent to do those acts." Nor did the court err in its instruction on the burden of proof.

■ Finally, there is no substance to defendant's claim that there should have been a pretrial severance of defendants or counts, or both. Passing the fact that no pretrial motion for severance was filed,[4] or at least is not part of the record, the question is whether the district court abused its discretion in not ordering severance. *United States v. Fusaro,* 708 F.2d 17 at 25 (1st Cir.1983); *United States v. Walker,* 706 F.2d 28 at 30 (1st Cir.1983). Abuse of discretion will be found only where the failure to sever deprives defendant of a fair trial and results in a possible miscarriage of justice. *United States v. Greenleaf,* 692 F.2d 182, 187 (1st Cir.1982); *United States v. Barbosa,* 666 F.2d 704, 708 (1st Cir.1981). Our review of the record discloses no reason for a severance, which was probably why trial counsel, who was different than appellate counsel, did not move for severance below.

*Affirmed.*

---

**4.** A motion for severance must be made prior to trial, Fed.R.Crim.P. 12(b)(5), or it is waived, Fed.R.Crim.P. 12(f); reversal is mandated only if there is plain error. *United States v. Greenleaf,* 692 F.2d 182, 187 (1st Cir.1982).