**UNITED STATES of America**

v.

**James F. BRENNAN, J. Edward McHugh.**

**Crim. No. 90–10235–WF.**

United States District Court, D. Massachusetts.

Oct. 3, 1991.

As Corrected Oct. 29, 1991.

---

1. The Secretary did not move to dismiss the claims based on this relationship.

**438**

S. Theodore Merritt, Peter E. Gelhaar, Asst. U.S. Attorney's Office, U.S. Dist. Court, Boston, MA, for U.S.

Joseph J. Balliro, Balliro, Mondano & Balliro, Philip X. Murray, Murray & Associates, Boston, MA, for James F. Brennan.

Wade M. Welch, Boston, MA, for J. Edward McHugh.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I.

After a twenty day jury trial, defendants James F. Brennan and J. Edward McHugh were convicted on charges that they conspired to commit bank fraud in violation of 18 U.S.C. § 1344 and to misapply the funds of the Cambridgeport Savings Bank ("CSB") in violation of 18 U.S.C. § 656. Brennan was also convicted of some, but not all, of the charges against him of bank fraud and misapplication of bank funds (as a co-conspirator or aider and abettor), and was found guilty of making false material statements on loan applications in violation of 18 U.S.C. § 1014. In addition, McHugh was convicted of some, but not all, of the charges against him of bank fraud and misapplication of bank funds, and was found guilty of making false entries in bank records in violation of 18 U.S.C. § 1005.

Each defendant has moved for a judgment of acquittal on all counts notwithstanding the verdict pursuant to Fed.R.Cr.P. 29(c). As set forth below, there was ample evidence to support the verdicts of guilty on all counts of conviction concerning Brennan. With regard to McHugh, the evidence was also adequate to sustain the jury's guilty verdicts on the counts of conviction concerning the charges of conspiracy, bank fraud, and misapplication of bank funds. Judgment of acquittal not withstanding verdict is, however, appropriate concerning the false entry charges on which McHugh was found guilty.

The foregoing conclusions present another question of practical significance in this case—the question whether the conspiracy between Brennan and McHugh continued after November 1, 1987, the effective date of the federal Sentencing Guidelines. *See* 18 U.S.C. 3551 note (effective date of the Sentencing Guidelines). As set forth below, the court concludes that the evidence indicates that: (1) a conspiracy between Brennan and McHugh to commit bank fraud and/or to misapply bank funds began before November 1, 1987; (2) McHugh did not withdraw from that conspiracy prior to November 1, 1987; and (3) overt acts were committed in furtherance of that conspiracy after November 1, 1987. Thus, although the court is entering a judgment of acquittal concerning the jury's verdict that McHugh was guilty of causing a false entry to be made on CSB's records on December 7, 1987—the sole count of conviction other than conspiracy (or aiding and abetting) alleged to have occurred after November 1, 1987—the Sentencing Guidelines must be applied in this case.

### II. *McHugh's Motion to Acquit*

#### A. *The Applicable Standards*

Fed.R.Civ.P. 29(c) provides that: "If a verdict of guilty is returned the court may ... set aside the verdict and enter judgment of acquittal."

> [T]he standard of review for a judgment of acquittal notwithstanding a verdict is identical to the test employed to measure the sufficiency of evidence supporting a guilty verdict. The test is whether, considering the evidence as a whole, taken in the light most favorable to the government, together with all legitimate inferences that can be drawn from such evidence, a rational trier of fact could have found guilt beyond a reasonable doubt. *United States v. Hensel,* 699 F.2d 18, 33 (1st Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431 [77 L.Ed.2d 1317] (1983). [The court] must resolve any issue of credibility in favor of the jury's

verdict, *United States v. Winter*, 663 F.2d 1120, 1127 (1st Cir.1981), and [ ] must defer to the jury's verdict if the evidence can support varying interpretations. *United States v. Rivera–Sola*, 713 F.2d 866, 869 (1st Cir.1983). In other words, the prosecutor need only produce that quantum of evidence by which a reasonable trier of fact could find guilt beyond a reasonable doubt; there is no requirement to produce evidence that would *compel* a finding of guilt beyond a reasonable doubt.

*United States v. McNatt*, 813 F.2d 499, 502 (1st Cir.1987).

Applying these principles to a motion for judgment of acquittal concerning a conspiracy charge, the Court of Appeals for the First Circuit has stated that:

A conspiratorial agreement may be proven by circumstantial as well as direct evidence.... The Government need not exclude "every reasonable hypothesis inconsistent with guilt" with respect to each piece of circumstantial evidence. Rather, "the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant the jury to conclude that the defendant is guilty beyond a reasonable doubt." *Dirring v. United States*, 328 F.2d 512, 515 (1st Cir.1964).

*United States v. Patterson*, 644 F.2d 890, 893 (1st Cir.1981).

B. *The Evidence Was Sufficient to Prove McHugh Conspired to Commit Bank Fraud*

■ Application of the foregoing standards to the evidence in this case persuades the court that McHugh's motion for judgment of acquittal concerning the jury's verdict on the charge that he conspired with Brennan to commit bank fraud must be denied. The court gave the jury detailed instructions regarding the conspiracy to commit bank fraud charge. These instructions included, but were not limited to, the following.[1]

■ In order to prove a conspiracy to commit bank fraud, the government is required to prove beyond a reasonable doubt that, among other things, each defendant acted with "intent to defraud." "Intent to defraud" means "to act knowingly and with specific intent to deceive, for the purpose of causing some financial or property loss to another." Generally, if an individual is shown to have knowingly and willfully participated in a conspiracy, he is guilty even if he participated in it to a degree more limited than his co-conspirator. It is not necessary for the government to demonstrate that a particular defendant benefitted personally from his scheme; nor must the government show that the defendants intended to deprive the bank of its money permanently. *See Golden v. United States*, 318 F.2d 357, 361–62 (1st Cir.1963); *United States v. Goldblatt*, 813 F.2d 619, 624 (3rd Cir.1987); *United States v. Caldwell*, 544 F.2d 691, 697 (4th Cir.1976).

■ Since an essential element of the crime charged is intent to defraud, good faith on the part of the defendant is a complete defense to a charge of bank fraud. An honest belief in the truth of representations when they were made by a defendant is a valid defense, however inaccurate the statements may turn out to be. However, a belief by a defendant that ultimately everything would work out so that no one would lose any money does not require a finding that he acted in good faith. No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for those involved will excuse fraudulent actions or false representations to obtain money. In

---

1. The jury instructions concerning bank fraud, misapplication of bank funds, making false entries on bank records, and making false statements to influence the action of a bank on a loan application were modeled on those suggested in Sand and Siffert, *Modern Federal Jury Instructions* §§ 44.01, 24.02, 37.10, and 37.03 (1991), modified to conform to the decisions of the Court of Appeals for the First Circuit, and tailored to the evidence in this case.

The jury was instructed to consider all of the instructions and not to rely on any element of them alone. The court has followed this principle in deciding the motions for judgment of acquittal. The instructions referred to in this decision relate to particularly relevant principles, but are not intended to be a complete statement of the applicable law.

this context a statement or representation is false if it is untrue when made and was then known to be untrue by the person making it or causing it to be made; a statement or representation is fraudulent if it is made falsely with intent to deceive.[2]

In this case, the indictment in essence alleged a fraudulent scheme, involving false representations by McHugh and Brennan, to obtain loans to Brennan and to conceal their delinquent status. *See* Indictment Count 1, ¶ 5(a). It was not alleged that the scheme was originally intended to deprive the bank of its funds permanently. Rather, it was consistent with the fraudulent scheme alleged for McHugh to have anticipated that CSB would eventually be repaid. Nor was it claimed that McHugh expected to profit corruptly from the scheme. Nevertheless, the indictment properly charged McHugh with conspiracy to commit bank fraud and the evidence was sufficient for the jury to convict him of this offense.

More specifically, the evidence was sufficient to prove that McHugh was a new commercial lending officer at CSB. CSB was trying to launch a significant commercial lending operation to complement its traditional business of making mortgage loans. McHugh was authorized to lend up to $500,-000 to a single borrower, and was required to get the approval of the CSB Board of Investment to lend more than this amount.

The evidence was also sufficient to prove that the conspiracy to defraud CSB was intended to obtain for Brennan funds of CSB which would not have been available to him if established standards had been applied and honest representations had been made by McHugh. For example, the jury could have properly concluded that the fraudulent scheme included: loans totalling more than $500,000 made by McHugh to Brennan, but falsely placed in the names of others, who were assured they would not have to repay them personally, in order to avoid McHugh's responsibility to report the loans to the CSB Board of Investment for its approval; McHugh writing false purposes for such loans on bank records (i.e. that the loan

proceeds would be used for the purchase of the Rochester Shoe Tree Company); McHugh concealing the existence and interconnected nature of the loans from the CSB Board of Investment; and McHugh causing the holding and/or redeposit of loan repayment checks written by Brennan on insufficient funds, in part to in effect provide Brennan with the interest-free use of CSB funds.

■ Accordingly, the jury could have properly concluded that McHugh engaged in a fraudulent scheme, involving representations he knew to be false, to get money temporarily for Brennan from CSB. *See United States v. Bonnett,* 877 F.2d 1450, 1454–57 (10th Cir.1989); *United States v. Clark,* 765 F.2d 297, 303 (2d Cir.1985). As indicated earlier, even if the jury believed that, as the evidence indicated, McHugh was not paid by Brennan for his participation in the scheme, but rather expected that eventually CSB would be repaid and profit, this would not constitute a valid defense to the conspiracy to commit bank fraud charge on which McHugh was convicted. *Goldblatt,* 813 F.2d at 624; *see also United States v. Silvano,* 812 F.2d 754, 759–60 (1st Cir.1987) (mail fraud).

### C. The Evidence Was Also Sufficient to Find McHugh Conspired to Misapply Bank Funds

■ Brennan and McHugh were charged with conspiring to commit bank fraud and to misapply bank funds. The government, however, was required to prove only a conspiracy to commit bank fraud *or* a conspiracy to misapply bank funds. *United States v. Hubbard,* 889 F.2d 277, 279 (D.C.Cir.1989). Nevertheless, the evidence was adequate to prove each of the alleged illegal objects of the conspiracy.

With regard to conspiracy to misapply bank funds, the jury was again instructed that, among other things, the government had to prove McHugh acted knowingly, for the benefit of himself or Brennan, "with intent to injure or defraud" CSB. McHugh was convicted of misapplication of bank funds

---

**2.** The foregoing statements of some of the relevant law are derived from different parts of the much more lengthy instructions given to the jury concerning bank fraud.

concerning alleged "sham" loans of: $332,-379, to JoAnn Brennan on August 11, 1987; $400,000 to Charles White on September 1, 1987; $500,000 to Joseph Hoffman on September 2, 1987; and $550,000 to The Harbor Group on (or about) November 3, 1987.[3]

The Court of Appeals for the First Circuit has in several cases addressed the circumstances in which loans to a named debtor may be found to constitute misapplication of bank funds when the loan proceeds are received by a third party. *See United States v. Gens*, 493 F.2d 216, 221–22 (1st Cir.1974); *United States v. Cyr*, 712 F.2d 729, 733 (1st Cir.1983); *United States v. Fusaro*, 708 F.2d 17, 20 (1st Cir.1983). Consistent with these standards, the court instructed the jury that:

> In deciding whether a defendant had the requisite intent, you should consider what his knowledge was of the transactions alleged to be willful misapplications of bank funds. For example, evidence that a defendant knowingly participated in deceptive or fraudulent transactions involving bank funds may indicate an intent to injure or defraud the bank.
>
> I instruct you, however, that a loan to one person with knowledge that the proceeds will be immediately given to someone else does not alone constitute a misapplication of bank funds. *Gens*, 493 F.2d at 222. Where the named debtor is both financially able to repay the loan and fully understands it is his responsibility to repay the loan, there is no misapplication of bank funds even if the bank official knows the named debtor will turn over the proceeds to a third party. *Id.*
>
> However, misapplication may be found if the bank official, directly or by adopting the assurance given by another, indicates to the named debtor that the bank will only look to the third party for repayment. *Id.; Fusaro*, 708 F.2d at 20 (bank officer aware named debtors assured they did not have to repay loans). In such situations, the loans are "sham" or "dummy" loans because there is little likelihood or expectation that the named debtor will repay the

loan. The knowing participation of a bank official in such a loan could be found to have a natural tendency to injure or defraud a bank and thus constitute willful misapplication within the meaning of § 656. *Id.*

> You may also consider the evidence concerning McHugh's loan authority on the question whether he acted with intent to injure CSB in his dealing with Brennan. *Fusaro*, 708 F.2d at 21; *Clark*, 765 F.2d at 303.

In this case there was ample evidence to establish a conspiracy to misapply bank funds. For example, with regard to the loan in the name of James Brennan's wife JoAnn, the proof included evidence that: James Brennan requested the loan; McHugh testified at his deposition that they "elected to use" Joann to evade the limits on his lending authority; no credit check was done concerning Joann; and all efforts to collect were directed at James Brennan, who eventually signed a note issued to rewrite the loan in the name of Joann.

Similarly, the evidence concerning the White and Hoffman loans was sufficient to demonstrate that McHugh, directly or by adopting Brennan's assurances, indicated that White and Hoffman would not be expected to repay the loans in their names. More specifically, the evidence could have reasonably been construed as proving that the loans in the names of White and Hoffman were made because McHugh's $500,000 lending limit would not permit him to make further loans to Brennan without Board of Investment approval; that McHugh did not want the Board to discover the difficulties with the earlier Brennan loans; and the Board would not have authorized further loans for Brennan's benefit if it had been honestly and accurately informed by McHugh. Such proof included, but was not limited to, evidence that: McHugh and Brennan discussed the Hoffman and White loans at a meeting on September 1, 1987; White believed he was co-signing a note to facilitate a loan to Brennan; McHugh caused CSB to

---

**3.** As discussed *infra*, this loan was approved on October 30, 1987 and the proceeds were applied by CSB on November 3, 1987 to cover Brennan's

loan repayment checks which had not been honored because they were drawn on insufficient funds.

look only to Brennan for repayment; the White and Hoffman transactions took less than five months each, with no discussion of terms; McHugh used Brennan's funds as an interest payment to make the loan in White's name appear less delinquent on about December 7, 1987; McHugh did not report the White and Hoffman loans to the Board of Investment for approval; McHugh did not discuss their relation to the Brennan loans at the December 7, 1987 Board meeting; and McHugh tried to hide from CSB's auditors the relationship to Brennan of the White and Hoffman loans.

Thus, the loans to Hoffman and White are closely comparable to those which resulted in the conviction of the bank officer in *Cyr*. In *Cyr*, the bank officer, Manning, could not make loans to his co-defendant without the prior approval of his superiors because of his lending limit; Manning knew those loans would likely be turned down if approval was requested; Manning made loans in the name of third parties knowing the proceeds would go to his co-defendant; and Manning knew the named borrowers did not intend to repay the loans themselves. *Cyr*, 712 F.2d at 733.

Manning's conviction for conspiring to misapply bank funds was affirmed, despite the fact that he did not personally profit from the scheme. The Court of Appeals for the First Circuit stated:

> We think it is clear that the evidence established beyond a reasonable doubt that defendant and Manning conspired together to misapply bank funds in violation of 18 U.S.C. § 371. The scheme of using nominee borrowers to obtain money from a bank for use by one who cannot herself arrange for a formal loan comes within the misapplication of bank funds prohibited by 18 U.S.C. § 656. *United States v. Gens,* 493 F.2d 216, 222 (1st Cir.1974). Nor can there be any doubt that there was sufficient evidence to have convicted Manning of the substantive offense. The facts proved a reckless disregard by Manning of his duties as a bank loan officer. Defendant argues that given sufficient time she could have repaid the loans.... But as we have already shown, the probability of repayment is of no legal consequence.

*Id.* at 734. This analysis is equally applicable in this case. *See also Fusaro,* 708 F.2d at 21 (fact that bank officer was not financially enriched by a scheme does not negate finding that he acted with requisite knowledge and intent to injure).

Finally, the evidence was adequate to permit a reasonably jury to find that the $550,000 loan to the Harbor Group was part of the conspiracy to misapply bank funds. More specifically, the evidence indicated: McHugh approved the issuance of the $550,000 loan; the loan clearly exceeded his personal lending authority; McHugh knew Harbor Group was synonymous with Brennan and in desperate financial condition; the loan was not reported promptly to the Board of Investment; rather the Harbor Group loan was used to mask the default status of loans to Brennan.

As the jury was instructed, since the evidence was adequate to convict McHugh on the conspiracy to misapply bank funds concerning the loans in the name of Joann Brennan, White, Hoffman, and Harbor Group, it was also appropriate for the jury to find McHugh guilty of the corresponding substantive charges (Counts 6, 7, 8, 9) on which McHugh was convicted of misapplication of bank funds pursuant to *Pinkerton v. United States,* 328 U.S. 640, 642-44, 66 S.Ct. 1180, 1181, 90 L.Ed. 1489 (1946).

D. *The Sentencing Guidelines Apply Because the Conspiracy Did Not End Prior to November 1, 1987.*

The indictment in this case charged a conspiracy between Brennan and McHugh beginning in or about June, 1987 and continuing until in or about March, 1988. *See* Count 1, ¶ 2. The jury was instructed, however, that it was not essential that the government prove that the conspiracy started and ended on those specific dates. Rather, the jury was told, that it was sufficient if it found the conspiracy charged was formed and existed for some time within the period set forth in the indictment and at least one overt act was committed in furtherance of the conspiracy during that period. Thus, the jury's verdict was not necessarily a determi-

nation that the conspiracy continued after November 1, 1987.

■ The duration of the conspiracy in this case determines whether the Sentencing Guidelines are applicable. As indicated earlier, the effective date of the Sentencing Guidelines was November 1, 1987. *See* 18 U.S.C. § 3551 note (effective date of Sentencing Guidelines). The Sentencing Guidelines apply to a conspiracy if it began prior to November 1, 1987, and continued after that date. *United States v. Arboleda,* 929 F.2d 858, 870 (1st Cir.1991); *United States v. Thomas,* 895 F.2d 51, 57 (1st Cir.1990).

■ It is the duty of the district court to determine for sentencing purposes whether the evidence proved a conspiracy which continued after November 1, 1987. *Arboleda,* 929 F.2d at 871; *United States v. Watford,* 894 F.2d 665, 671 (4th Cir.1990); *United States v. Williams,* 897 F.2d 1034, 1040 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991). This decision must be based upon a preponderance of the evidence. *Watford,* 894 F.2d at 671.

As described earlier, the alleged conspiracy in this case was not intended to deprive CSB permanently of the funds furnished to Brennan. Rather, it was intended to provide Brennan with loans the CSB Board of Investment would not have approved if it had been properly informed by McHugh, and to conceal from the Board (and some others) the delinquent status of those loans until they could be repaid. More precisely, with regard to McHugh the indictment alleged that to "effectuate the plan of the conspiracy" McHugh would:

a) exceed his lending authority and conceal from the Board of Investment the existence and interconnected nature of the loans to Brennan;

b) hold or cause the redeposit of loan repayment checks provided by Brennan which were returned as being drawn on insufficient funds or a closed account, resulting in Brennan's interest-free use of CSB's funds;

c) cause entries to be omitted from bank records to make it appear that Brennan's loans were current and thereby conceal the true status of the loans from bank auditors, external auditors, and the Board of Investment;

d) rewrite new unsecured loans to Brennan to pay off loans past due; and

e) cause the proceeds of loans to Brennan's nominees to be distributed directly into accounts over which Brennan had control.

Indictment, Count 1, ¶ 5.

The nature of these charges is important to the court's conclusion that the conspiracy between Brennan and McHugh continued beyond November 1, 1987. McHugh authorized the $550,000 loan in the name of Harbor Group on October 30, 1987. This loan did not result in the disbursement of any funds. Rather, the amount of the loan was used by CSB to cover the Brennan loan repayment checks which had not been honored because they were drawn on insufficient funds. These outstanding returned items were eliminated on the books of CSB on November 3, 1987. The court doubts that this alone would be sufficient to prove that the conspiracy extended beyond November 1, 1987.

■ However, after November 1, 1987, McHugh engaged in a number of activities to conceal the conspiratorial scheme. These included continuing to cause CSB to hold and/or redeposit Brennan's bad checks; causing funds held in the name of Brennan to be credited as an interest payment on the loan in the name of White in order to take it out of the "danger zone" on the bank's loan delinquency reports, and thus reduce the risk that the loan would attract the attention of the Board of Investment at its December 7, 1987 meeting; failing to inform the Board on December 7, 1987, of the interrelated character of the Brennan, Hoffman, White, and Harbor Group loans; agreeing to the issuance of the December 31, 1987 $225,000 note in the name of James Brennan to replace the outstanding checks which had been written on insufficient funds; and in January, 1988 trying to hide from CSB's outsider auditors the related character of the various loans. Although none of these acts were

alone illegal,[4] overt acts in furtherance of a conspiracy need not be unlawful by themselves. *Yates v. United States*, 354 U.S. 298, 334, 77 S.Ct. 1064, 1084, 1 L.Ed.2d 1356 (1957); *United States v. Medina*, 761 F.2d 12, 15 (1st Cir.1985). In this case, the foregoing acts constitute a continuation of the original conspiracy after November 1, 1987.

▮ Acts of covering up alone may be insufficient to prove the continuation of an otherwise completed conspiracy. *Grunewald v. United States*, 353 U.S. 391, 402, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957). As the Supreme Court stated in *Grunewald:*

> [A] vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.

*Id.* at 405, 77 S.Ct. at 974. Only the former constitute overt acts in furtherance of a single, continuing conspiracy.

However, as the earlier quoted allegations concerning McHugh's role indicate, concealing the fact that McHugh exceeded his lending authority in furnishing funds to Brennan and concealing the delinquent status of those loans until they could be repaid were at the heart of the conspiratorial scheme in this case. Thus, McHugh's efforts to conceal the nature and status of the loans constituted the continuation of a single conspiracy beyond November 1, 1987. *See United State v. Colasurdo*, 453 F.2d 585, 592–93 (2nd Cir.1971) (where the conspiracy involved sham transactions intended to conceal information from the Securities and Exchange Commission, subsequent filing of false statements to the Commission were acts in furtherance of that

conspiracy); *United States v. Culoso*, 461 F.Supp. 128, 132–33 (S.D.N.Y.1978).

▮ The conclusion that the conspiracy continued after November 1, 1987, is reinforced if the issue is analyzed in the framework of whether McHugh withdrew from the conspiracy prior to November 1, 1987. Brennan and McHugh were the only alleged conspirators in this case.[5] Thus, a withdrawal by McHugh would have terminated the conspiracy because a conspiracy is, by definition, an agreement between at least two people.

▮ The evidence, however, does not show that McHugh withdrew from the conspiracy prior to November 1, 1987. *See Arboleda*, 929 F.2d at 870–71 (defendant "failed to show" that he withdrew from conspiracy, so Sentencing Guidelines apply); *Watford*, 894 F.2d at 670 (the burden is on defendant to show that he withdrew from conspiracy in order to show Sentencing Guidelines do not apply); *United States v. Pippin*, 903 F.2d 1478, 1481 (11th Cir.1990) (same). As the Court of Appeals for the First Circuit has recently reiterated:

> "In order to show withdrawal, a conspirator must act affirmatively to either defeat or disavow the purpose of the conspiracy." *United States v. Dunn*, 758 F.2d 30, 38 (1st Cir.1985). "Typically, there must be evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." *United States v. Piva*, 870 F.2d 753, 757 (1st Cir. 1989) (quoting *United States v. Juodakis*, 834 F.2d 1099, 1102 (1st Cir.1987) (per curiam)).

*Arboleda*, 929 F.2d at 871. Mere disagreement between conspirators does not neces-

---

**4.** The defendants were acquitted of the charges that the December 31, 1987 loan constituted a misapplication of bank funds (Count 10) and the court is vacating McHugh's conviction for causing a false entry on a bank record to be made on December 7, 1987 (Count 14). Nevertheless, this conduct may properly be considered in determining whether the conspiracy continued after November 1, 1987. *See Watford*, 894 F.2d at 671 (fact that defendant was acquitted of a substantive offense that was alleged to have been committed after November 1, 1987, fell short of establishing defendant had withdrawn from the

conspiracy for purposes of determining if the Sentencing Guidelines apply).

**5.** The indictment also referred to other, known and unknown conspirators. Count 1, ¶ 2. However, pursuant to the parties agreement, the jury was instructed that Brennan and McHugh were the only alleged conspirators and the jury had to find either that both were guilty of the conspiracy charge or that both were not guilty of that charge.

sarily demonstrate withdrawal. *Dunn,* 758 F.2d at 38.

McHugh did in November, 1987, escalate his efforts to get Brennan to repay CSB. Seeking repayment did not, however, constitute disavowing the conspiratorial scheme. Rather, repayment of the excessive and delinquent loans was always part of the fraudulent scheme and necessary for it to succeed.

Nor did McHugh act to defeat the purpose of the conspiracy. He certainly did not confess to the authorities. Neither did McHugh by word or deed communicate to Brennan that he had abandoned the enterprise or its goals. Rather, his conduct after November 1, 1987, conveyed his willingness to continue to conceal what had occurred from the CSB Board of Investment and others in order to give Brennan an extended opportunity to save the fraudulent scheme by repaying CSB.

 Brennan also committed numerous overt acts after November 1, 1987, including but not limited to furnishing CSB with checks written on insufficient funds to perpetuate the illusion that he was repaying his loans. Absent a withdrawal by McHugh, these acts alone suffice to extend the conspiracy beyond the effective date of the Sentencing Guidelines. *United States v. Williams,* 897 F.2d 1034, 1040 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991); *United States v. Lee,* 886 F.2d 998, 1003 (8th Cir.1989), *cert. denied,* 493 U.S. 1032, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990).

Accordingly, the court concludes that the conspiracy in this case continued after November 1, 1991. Therefore, the Sentencing Guidelines must be applied.

E. *The Evidence Was Not Sufficient to Convict McHugh of Causing False Entries to be Made On Bank Records With Regard to Counts 11, 12, 13 and 14.*

 McHugh was convicted on Counts 11, 12, and 13 of violating 18 U.S.C. § 1005 by "knowingly and willfully" causing the omission of reversing journal entries on CSB's Commercial Loan Transaction Journal ("CLTJ"), which would have re-established the loans to Brennan as unpaid on the records of CSB. The loans were recorded as paid on the CLTJ when Brennan's checks were received. The indictment alleged these entries were not reversed, and loans were not properly reflected as unpaid, when those checks were returned for insufficient funds because McHugh instructed CSB employees to hold and/or redeposit the bad checks. The evidence was inadequate to sustain the jury's verdicts on these counts because it was insufficient to prove beyond a reasonable doubt that McHugh knew that the CLTJ entries were not being reversed to record again the loans as unpaid.

In the course of the court's instructions, the jury was informed that "knowingly" means to act voluntarily and deliberately, rather than by accident or mistake, and that "willfully" means to act voluntarily and intentionally with a bad purpose either to disobey or disregard the law. With regard to § 1005, the jury was instructed that the government had to prove: that a defendant caused a particular entry to be made; that the entry was false and known to be false by the defendant; that an omission of information as well as an actual misstatement could qualify as a false entry; and that the defendant acted willfully with intent to injure or defraud the bank or deceive its officers. *See United States v. Sheehy,* 541 F.2d 123, 129 (1st Cir.1976); *United States v. Copple,* 827 F.2d 1182, 1187 (8th Cir.1987), *cert. denied,* 484 U.S. 1073, 108 S.Ct. 1046, 98 L.Ed.2d 1009 (1988); *United State v. Lichenstein,* 610 F.2d 1272, 1276–77 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980); *United States v. McGuire,* 744 F.2d 1197, 1202 (6th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 159 (1985).

The evidence indicated that Robert Jumper of CSB had a practice of reversing CLTJ entries reflecting payments on mortgages if a check was twice returned for insufficient funds. Contrary to this practice, McHugh instructed Jumper to hold and/or redeposit Brennan's numerous loan repayment checks when they were continuously returned for insufficient funds. The effect of this was to

prevent Jumper from reversing the CLTJ entries and reflecting the loans as unpaid. McHugh did not, however, instruct Jumper with regard to those entries. Rather, there was no evidence that McHugh and Jumper ever discussed how the transactions in question would be reflected on the CLTJ or other books of CSB.

The government did introduce deposition testimony of McHugh concerning the way other banks with which he had been associated had maintained records relating to bad checks being submitted for repayment. The government contends that the jury could, therefore, have properly inferred that he knew the effect that his instructions would have on the CLTJ entries. This contention, however, is incorrect. While there was adequate evidence to prove that McHugh directed the checks to be held or redeposited as part of a scheme to defraud CSB, there was not sufficient evidence that he knew, or intended, that false statements or omissions would be made on the CLTJ as part of this effort.

Accordingly, the case is analogous to *United States v. Rapp,* 871 F.2d 957, 964 (11th Cir.), *cert. denied,* 493 U.S. 890, 110 S.Ct. 233, 107 L.Ed.2d 184 (1989). In *Rapp,* the defendant set in motion the filing with a bank of false affidavits as part of a scheme to defraud. He was, however, acquitted of improperly causing the false entries in bank records which the affidavits constituted because:

> The record [was] devoid of evidence that Rapp knowingly or willfully directed or authorized the making of the affidavits. No witness testified that Rapp specifically directed the affiants to execute the documents or that he had knowledge that affidavits would have to be executed to consummate the loan. In fact, there is no evidence that Rapp even knew, prior to reading the indictment, that affidavits had been executed.

*Id.* The situation is essentially the same with regard to McHugh and the entries in the CLTJ in this case. Thus, as in *Rapp,* this case is distinguishable from *United States v. Giles,* 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493 (1937), in which the defendant was found to have been properly convicted because he knew that false entries on the bank's ledgers necessarily would result from his deliberate action of withholding deposit tickets.

In addition, it is important to note that in contrast to the counts concerning misapplication of bank funds and bank fraud, the indictment did not charge that McHugh aided, abetted, or caused false entries to be made on bank records in violation of 18 U.S.C. § 2. Nor, again in contrast to the misapplication of bank funds charges (Count 5–10), did the government request or receive an instruction under *Pinkerton, supra,* that the false entries in the CLTJ could have been foreseen as a natural and probable consequence of the conspiracy and, therefore, McHugh could be held criminally responsible for them. Such an instruction might have been appropriate, but cannot in this case provide a basis for sustaining the verdicts on Count 11, 12 and 13. *Rapp,* 871 F.2d at 964; *compare United States v. Austin,* 585 F.2d 1271, 1277 (5th Cir.1978) (defendant charged as an aider and abettor).

■ The remaining false entry count, Count 14, charged that McHugh "knowingly and willfully" caused a false entry to be made on the General Ledger of CSB, on or about December 7, 1987, indicating that Charles White had made an interest payment on the loan in his name, rather than reflecting that the payment had been made with funds furnished by Brennan. The evidence is insufficient to sustain this conviction because it could not properly have been construed to demonstrate that McHugh acted knowingly and willfully to cause the entry in question to be made, or that the entry was false.

With regard to Count 14, the evidence was that on or about December 7, 1987, McHugh instructed Jumper to apply $7,358.31 held by CSB in Brennan's name to make the interest payment necessary to take the loan in the name of White out of the "danger zone" on the CSB loan delinquency reports. As indicated earlier, there was ample evidence to prove McHugh did this to keep the Board of Investment from focusing on this loan at its December 7, 1987 meeting with McHugh or

when it otherwise reviewed loan delinquency reports.

The transaction in question resulted in an entry on the computerized CSB General Ledger showing an interest payment on the loan in the name of White. *See* Exhibit 150. Jumper also recorded this payment in handwritten records of the bank, expressly noting that the funds came from James F. Brennan. *See* Exhibit 135.

In these circumstances, the conviction of McHugh on Count 14 must be set aside because the evidence was again insufficient to show that McHugh knew what entry would be made on the General Ledger, or that he intended it to be false. The evidence presented was sufficient to prove that McHugh caused the interest payment to be made in order to deceive the Board of Investment and as part of a scheme to defraud. There was, however, no evidence that McHugh knew how the transaction would be reflected on the General Ledger or, as charged in the indictment, acted willfully to cause a false entry in that record. Once again, there also was no *Pinkerton* charge or instruction on aiding and abetting that might have permitted a finding that McHugh was guilty concerning Count 14.

The evidence may have been sufficient to prove that McHugh knowingly caused an entry to be made on the CSB loan delinquency reports in order to deceive bank officials. This, however, was not the crime charged in the indictment. Thus, McHugh could not be properly convicted for causing a false entry on the loan delinquency reports. *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960).

The conviction on Count 14 must also. be set aside because the entry on the general ledger reflected an actual transaction and was literally true. *United States v. Hardin*, 841 F.2d 694, 699 (6th Cir.1988). The entry on the General Ledger recorded an interest

payment on the loan in White's name, but did not purport to identify the source of the funds. *See* Exhibit 150. Such a payment was made, the transaction was entered as it occurred, and thus the entry was not false. *Id.*[6]

Accordingly, the motion for judgments of acquittal on Counts 11, 12, 13, and 14 must be granted.

III. *Brennan's Motion to Acquit*

A. *The Evidence Was Sufficient to Prove Brennan Conspired to Commit Bank Fraud and to Misapply Bank Funds*

Brennan's motion for a judgment of acquittal notwithstanding verdict concerning the conspiracy to commit bank fraud and to misapply bank funds, as well as the related substantive charges, simply adopts McHugh's arguments. Thus, Brennan's motion with regard to these charges is also without merit. Indeed, the evidence indicated that Brennan's role in the conspiracy was considerably greater than McHugh's and only Brennan corruptly profited from their scheme.

■ Although Brennan does not raise the argument, the court also notes that although the jury acquitted McHugh on the charge in Count 6 of misapplying bank funds in connection with the August 3, 1987, $500,000 loan to James Brennan, this does not justify entering a judgment of acquittal for Brennan on the related charge against him in Count 5. The evidence was sufficient for the jury to have found that the substantive crime charged in Count 6 was committed by McHugh. Thus, it was permissible for the jury to have found that Brennan was guilty of that crime as a co-conspirator under *Pinkerton, supra,* or as an aider and abettor under 18 U.S.C. § 2. Although there is an inconsistency in the jury's decision to acquit McHugh on Count 6 and to convict Brennan

---

**6.** This case is distinguishable from *United States v. Sheehy*, 541 F.2d 123, 129 (1st Cir.1976), in which a conviction for making a false entry was sustained where the bank's books listed an unsecured loan as being secured. In addition, this court's analysis is not inconsistent with the reasoning of *United States v. Walker*, 871 F.2d 1298, 1308 (6th Cir.1989). In *Walker*, the court found false entries because the bank records reflected payments of sham borrowers, rather than in the name of the true recipient of the loans. *Id.* As stated earlier, in this case the General Ledger did not seek to record who made the interest payment at issue and, therefore, was not false because it failed to reflect Brennan as the source of the funds.

on Count 5, the Court of Appeals for the First Circuit has held, in virtually identical circumstances, that such inconsistency is not sufficient reason for setting a conviction aside. *Cyr*, 712 F.2d at 732.

B. *The Evidence was Sufficient to Convict Brennan of Making False Statements on His Personal Financial Statements for the Purpose of Influencing CSB.*

 Brennan was convicted on Counts 2 and 3 with violating 18 U.S.C. § 1014 by knowingly making false material statements on his Personal Financial Statement for the purpose of influencing the action of CSB on his loan applications. There was ample—indeed overwhelming—evidence to prove that the Personal Financial Statements were false and that the other elements of § 1014 were met.

Brennan contends, however, that if McHugh was his co-conspirator, the conspiracy precluded Brennan from having the requisite "purpose of influencing" the bank necessary for a conviction under § 1014. This assertion, however, is incorrect. First, McHugh was not charged with conspiring with, or aiding and abetting, Brennan with regard to the Personal Financial Statements. It was neither alleged, nor necessarily proven that McHugh knew that they were false.

Second, and perhaps more importantly, § 1014 focuses on Brennan's intentions in furnishing the false Personal Financial Statements, rather than on whether the bank was actually influenced by them. The government was not required to prove that CSB actually relied on the false Personal Financial Statements, and it was of no consequence whether or not a bank official knew those statements were false when submitted. *United States v. Norberg*, 612 F.2d 1, 4–6 (1st Cir.1979); *United States v. Bush*, 599 F.2d 72, 75–77, (5th Cir.1979); *United States v. Braverman*, 522 F.2d 218, 223 (7th Cir. 1975); *United States v. Johnson*, 585 F.2d 119, 123–25 (5th Cir.1978).

In this case there was formidable evidence that Brennan presented false Personal Financial Statements, intending to portray himself as a person of substantial net worth and virtually no unsecured debts, because he knew satisfactory Personal Financial Statements were routinely required to obtain the type of loans he was desperately seeking from CSB. The jury could have easily and Financial Statements were made to influence CSB to grant the loans, regardless of what McHugh knew.

As the court found in the course of the trial, the alleged false representations on the Personal Financial Statements were material. *United States v. Whaley*, 786 F.2d 1229, 1231–32 (4th Cir.1986) (materiality held to be an issue for the court). Accordingly, Brennan was properly convicted on Counts 2 and 3.

IV. *Order*

In view of the foregoing, it is hereby ORDERED that:

1. James F. Brennan's Motion for judgment of acquittal on all counts notwithstanding the verdict is DENIED.

2. J. Edward McHugh's motion for judgment of acquittal notwithstanding the verdict is ALLOWED as to Counts 11, 12, 13 and 14, and DENIED as to Counts 1, 4, 6, 7, 8, and 9.

3. The Sentencing Guidelines are applicable in this case.

4. Sentencing is scheduled for December 18, 1991, at 3:00 p.m. The parties shall comply with the attached order concerning preparation of the Presentence Report. If the parties wish to file sentencing memoranda or other supplementary information, such submissions shall be made by December 9, 1991.

5. A conference to discuss sentencing matters shall be held on October 23, 1991 at 4:00 p.m.