United States Court of Appeals
For the First Circuit

No. 92-1169

UNITED STATES,
Appellee,

v.

JAMES F. BRENNAN,
Defendant, Appellant.

No. 92-1170

UNITED STATES,
Appellee,

v.

J. EDWARD MCHUGH,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Torruella, Cyr, and Stahl,
Circuit Judges.

Philip X. Murray with whom Lorusso & Loud was on brief for

appellant Brennan.
Wade M. Welch for appellant McHugh.

S. Theodore Merritt, Assistant United States Attorney, with whom

A. John Pappalardo, United States Attorney, was on brief for appellee.

June 3, 1993

STAHL, Circuit Judge. On September 18, 1990, a

federal grand jury returned a multiple count indictment

against defendant-appellant J. Edward McHugh, a former senior

vice-president and loan officer of the Cambridgeport Savings

Bank ("CSB"), and defendant-appellant James F. Brennan, a

borrower of large sums of money from CSB. The indictment

charged both defendants with one count of conspiracy to

commit bank fraud and to willfully misapply bank funds;

McHugh with one count of bank fraud, six counts of willful

misapplication of bank funds, and four counts of making false

entries in bank records; and Brennan with two counts of

making false statements to a lending institution, one count

of aiding and abetting McHugh's bank fraud, and six counts of

aiding and abetting McHugh's willful misapplication of bank

funds. After a twenty-day trial, a jury returned verdicts of

guilty against both defendants on most of the counts. It

did, however, acquit McHugh on two counts of willful

misapplication and Brennan on one count of aiding and

abetting a willful misapplication of bank funds.

Following the verdict, the trial judge issued a

comprehensive, twenty-seven page memorandum and order denying

Brennan's pending motion for acquittal on all counts charged,

but granting McHugh's pending motion for acquittal insofar as

it related to the four counts for making false entries in

-2-
2

bank records.1 After a two-day sentencing hearing, Brennan

was sentenced to forty-one months in prison and McHugh was

sentenced to a year and a day in prison.

On appeal, McHugh and Brennan raise a host of

challenges to the trial proceedings. Their complaints can be

loosely divided into two categories: (1) there was

insufficient evidence to support certain of their

convictions, and (2) a number of decisions of the trial judge

regarding the parameters of the trial, the admissibility of

certain disputed evidence, and the jury instructions

constituted reversible error. Brennan also advances

miscellaneous arguments that he was victimized by

constitutionally infirm legal representation at trial and

that his sentence was unlawful. After carefully reviewing

the voluminous record in the light of appellants'

contentions, we affirm.

I.

BACKGROUND2

Because attempting to recount the evidence in this

case would be both unnecessary and inherently Sisyphean, we

1. McHugh's motion, which sought acquittal on all counts
charged, was otherwise denied.

2. As is always the case when we consider whether there was
sufficient evidence to support a conviction, we review the
evidence in the light most favorable to the government and
resolve all credibility issues in favor of the verdict. See,

e.g., United States v. Guzman-Rivera, No. 92-1855, slip op.

at 6 (1st Cir. April 9, 1993).

-3-
3

cut to the heart of the matter. McHugh was hired by CSB on

May 24, 1987, as a senior vice-president and senior loan

officer in charge of commercial lending. At the time of

McHugh's hiring, CSB had a relatively small commercial

lending department. Among other things, McHugh was charged

with increasing the volume of commercial loans. To that end,

CSB's Board of Investment ("the Board") provided McHugh with

a personal lending authority of up to $500,000 per borrower.

Commercial loans in excess of $500,000 to any single borrower

could not, however, be made without prior Board approval.

On June 5, 1987, Brennan met with McHugh and

requested a $70,000 unsecured loan from CSB.3 In connection

with the requested loan, Brennan provided CSB with a signed

Personal Financial Statement ("PFS"). The PFS contained a

preamble indicating that the borrower would notify the bank

of material changes in his/her financial condition. Evidence

introduced at trial revealed that Brennan made statements on

his PFS pertaining to his income, real estate holdings, notes

payable to others, and contingent liabilities that were false

both at the time they were submitted and throughout Brennan's

relationship with CSB. McHugh approved the loan and, in

accordance with the agreed upon procedures, presented it to

the Board. The Board subsequently signed off on it. On the

3. McHugh and Brennan had a prior business relationship when
McHugh was a senior lender at First Mutual Bank.

-4-
4

term sheet which was required for each loan made, McHugh

noted that the purpose of the $70,000 loan was "[t]o assist

in the purchase of stock in Harbor Group, Inc."4 Evidence

suggested, however, that Brennan used the loan to cover

overdrafts he had written at the Yankee Bank.

So began a relationship that, throughout the

remainder of 1987, led to the extension of nine additional

loans by McHugh to Brennan, persons closely affiliated with

Brennan, or Brennan-controlled entities. The dates, amounts,

and persons/entities who received these subsequent loans we

summarize as follows:

1. A July 17, 1987, loan to Brennan for
approximately $250,000;
2. A July 20, 1987, loan to Brennan for
approximately $100,000;
3. An August 3, 1987, loan to Brennan for
approximately $500,000;
4. An August 11, 1987, loan to JoAnn Brennan, the
defendant's wife, for approximately $332,000;
5. A September 1, 1987, loan to Charles White, a
friend of Brennan, for approximately $400,000;5
6. A September 2, 1987, loan to Joseph Hoffman, a
business associate of Brennan, for approximately
$500,000;6
7. A September 22, 1987, loan to the Harbor Group
for approximately $500,000;

4. The Harbor Group was a Brennan-controlled company
organized primarily to acquire and sell other companies.

5. Although White was the nominal borrower of the $400,000,
the evidence reveals that the money was wired by CSB directly
to an account maintained by Brennan at the Shore Bank.

6. Again, although Hoffman was the nominal borrower of the
$500,000, the evidence shows that the money was wired
directly by CSB to Brennan's account at the Shore Bank.

-5-
5

8. An October 30, 1987, loan to the Harbor Group
for approximately $550,000; and
9. A December 31, 1987, loan to Brennan for
approximately $225,000.

Evidence at trial revealed that Brennan used the

proceeds of many of these loans to pay off debts, both to CSB

and elsewhere, rather than for the purposes recorded on the

relevant term sheets. The evidence also indicated or tended

to indicate (1) that many of Brennan's repayment checks

bounced but were redeposited at McHugh's direction; (2) that

McHugh did not bring these loans and their interconnected

nature to the attention of either the Board or James Keegan,

CSB's president; (3) that McHugh took affirmative steps to

conceal from others at the bank Brennan's problems repaying

the loans; (4) that McHugh exceeded his loan authority in

making some of these loans; (5) that McHugh made and

structured some of these loans in order to circumvent his

lending authority, and so that he would not have to bring

them to the Board's attention; (6) that no loan file or term

sheet was created for the JoAnn Brennan loan; (7) that the

loans to JoAnn Brennan and Charles White were made with

little or no inquiry into or knowledge of the named debtors'

actual abilities to repay the loans; (8) that McHugh

knowingly caused false purposes for the White and Hoffman

loans to be recorded on their respective term sheets; (9)

that McHugh was aware that JoAnn Brennan, White, and Hoffman

expected James Brennan to repay the loans taken out in their

-6-
6

names; (10) that the $550,000 loan to the Harbor Group, which

was guaranteed by Brennan, was made to disguise the fact that

certain loans to Brennan and Brennan-controlled interests

were delinquent; (11) that, with regard to the White loan,

McHugh directed that Brennan funds be used to make an overdue

interest payment; and (12) that, with regard to the White

loan, Brennan furnished CSB with a PFS, purportedly on

White's behalf, which was riddled with false statements.

During the first week in March of 1988, Keegan

became aware that many of the aforementioned loans were both

interconnected and delinquent, ordered internal and external

audits, and instructed McHugh to send letters to the named

borrowers demanding payment. McHugh was terminated on March

11, 1988. The financial loss to CSB exceeded $2,200,000.

II.

DISCUSSION

A. Sufficiency of the Evidence

McHugh argues that there was insufficient evidence

to support any of his convictions. Brennan contends that

there was insufficient evidence to support his convictions on

the counts charging conspiracy and making false statements to

a lending institution.7 As we have noted, after the

7. In his reply brief, Brennan also expresses a desire to
join in McHugh's arguments "relative to misapplication and
multiplicity." However, it is well settled that "a legal
argument made for the first time in an appellant's reply
brief comes too late and need not be addressed." Rivera-

-7-
7

conclusion of the trial, the district court issued a

comprehensive, twenty-seven page memorandum and order which,

among other things, responded to these very arguments. The

memorandum and order surveyed authority pertinent to each of

the defendants' arguments, reviewed the evidence in the

manner mandated by the appropriate legal standard,8 and

clearly articulated both its conclusions and its reasons

therefor. We have carefully reviewed the record and, having

employed a standard of review which mirrors that applied by

the district court to defendants' motions for acquittal, see,

e.g., United States v. St. Michael's Credit Union, 880 F.2d

579, 584 (1st Cir. 1989) ("[T]he standard of review for a

judgment of acquittal notwithstanding the verdict is

identical to the test employed to measure the sufficiency of

evidence supporting a guilty verdict.") (brackets in

original) (quoting McNatt, 813 F.2d at 502), find ourselves

in complete agreement with the conclusions reached by the

Muriente v. Agosto-Alicea, 959 F.2d 349, 354 (1st Cir. 1992).

Accordingly, Brennan has waived the aforementioned arguments
on appeal.

8. Quoting United States v. McNatt, 813 F.2d 499, 502 (1st

Cir. 1987), the district court correctly noted the standard
under which the defendants' motions were properly evaluated:
"The test is whether, considering the evidence as a whole,
taken in the light most favorable to the government, together
with all legitimate inferences that can be drawn from such
evidence, a rational trier of fact could have found guilt
beyond a reasonable doubt." United States v. Brennan, Cr.

No. 90-10235-WF, slip op. at 3 (D. Mass. Oct. 3, 1991,
corrected Oct. 29, 1991).

-8-
8

district court. We therefore reject defendants' sufficiency

challenges substantially on the basis of the district court's

opinion. We pause to address only one issue.

In arguing that there was insufficient evidence to

support his convictions for willful misapplication of bank

funds9 arising out of the October 30, 1987, $550,000 loan to

the Harbor Group and the loans extended to White, Hoffman,

and JoAnn Brennan, McHugh contends that our previous opinion

in Gens, see supra note 9, mandates a ruling in his favor.

After careful consideration, we do not agree.

In Gens, several bank officers were convicted of

willful misapplication under 18 U.S.C. 65610 for making

9. As one commentator has noted, "[W]illful misapplication
is a term that carries no technical or precisely limited
meaning." John K. Villa, Banking Crimes, 3.02[3][c][ii]

(1992); see also United States v. Gens, 493 F.2d 216, 221

(1st Cir. 1974). It is established in this circuit, however,
that "the sine qua non of charges of willful misapplication

of bank funds is action taken with the knowledge of harm to,
intent to harm, or reckless disregard for, the financial
health of the bank." United States v. Fusaro, 708 F.2d 17,

21 (1st Cir.), cert. denied, 464 U.S. 1007 (1983); see also

United States v. Cyr, 712 F.2d 729, 732 (1st Cir. 1983) ("[A]

reckless disregard by a bank official of his bank's interest
is sufficient to establish the requisite intent to defraud.")
(quoting United States v. Larson, 581 F.2d 664, 667 (7th Cir.

1980)). The probability that the debtor will repay the
misapplied funds is not legally significant. Cyr, 712 F.2d

at 732. This authority formed the foundation for the
district court's jury instructions on the willful
misapplication counts.

10. In relevant part, 18 U.S.C. 656 provides:

Whoever, being an officer, director, agent or
employee of, or connected in any capacity with any
. . . insured bank, . . . willfully misapplies any

-9-
9

loans to certain individuals while aware that the proceeds

would be turned over to a borrower who, because he had

reached the bank's lending limit, could not be loaned any

more money. In surveying the indictment and charge to the

jury in that case, we first determined that the jury had been

instructed to find defendants guilty "if it . . . found that

[defendants] granted the loans to the named debtors knowing

that the proceeds would be turned over to [the off-limits

borrower]." Id. at 221. We then reversed the convictions,

noting that "such a finding by itself is not sufficient to

constitute willful misapplication under 656." Id.

(Emphasis supplied). In so doing, we made clear that "where

the named debtor is both financially capable and fully

understands that it is his responsibility to repay, a loan to

him cannot -- absent other circumstances -- properly be

characterized as sham or dummy [and therefore illegal], even

if bank officials know he will turn over the proceeds to a

third party." Id. at 222. (Emphasis supplied).11

of the moneys, funds or credits of such bank . . .
shall be fined not more than $1,000,000 or
imprisoned not more than 30 years, or both[.]

11. On the one count where it was unclear whether the named
debtor understood his repayment obligation on the loan at
issue, we reversed the conviction but remanded for a new
trial. Id. at 223-24. On all the other counts, because the

evidence revealed that the loans at issue were to named
debtors who clearly were financially capable and understood
that it was their obligation to repay, we simply reversed the
defendants' convictions. Id. at 223.

-10-
10

Although we did not specifically say so, clearly underpinning

our holding was the belief that, without more, a rational

factfinder cannot infer an intent to defraud the bank on the

part of a bank official who simply makes a loan to a

financially capable party who understands his/her repayment

obligation. See generally id. at 222-23.

The facts here are considerably different from those in

Gens. As we have stated, there was evidence from which a

rational jury could have concluded that JoAnn Brennan, White,

and Hoffman did not themselves expect to repay CSB.

Moreover, there was evidence suggesting that, with regard to

the JoAnn Brennan and White loans, McHugh made little or no

effort to determine the actual financial capabilities of the

named debtors.12 Thus, with regard to the JoAnn Brennan,

White, and Hoffman loans, the jury could have concluded that

this was not a situation where, at the time the loans were

extended, McHugh knew that the named debtors were both

financially capable and fully understood their obligations to

repay the loans. See id. at 222.

More importantly, this also is a case where there

were "other circumstances," see id., which serve to render

the reasoning of Gens inapposite. There was evidence from

12. Indeed, there was evidence which tended to indicate that
White, JoAnn Brennan, and the Harbor Group were not

financially capable of repaying the loans on which they were
the named debtors.

-11-
11

which the jury could have inferred, among other things, (1)

that McHugh knowingly caused false purposes for the loans to

Charles White and Joseph Hoffman to be recorded on their

respective term sheets; (2) that McHugh failed to follow

customary bookkeeping procedures in extending the loan to

JoAnn Brennan; (3) that McHugh exceeded his loan authority in

making the loan to the Harbor Group; and (4) that the loan to

the Harbor Group was made for the purpose of disguising the

fact that certain loans to Brennan and Brennan-controlled

interests were delinquent. Moreover, there was evidence from

which a jury could have found that McHugh structured these

loans so that he would not have to present them to the Board

for prior approval.13 In our view, these are precisely the

types of circumstances that could have led the jury to

conclude that McHugh, in extending these loans, exhibited "a

reckless disregard" of CSB's interests. See Cyr, 712 F.2d at

732; Fusaro, 708 F.2d at 21. Accordingly, we decline to

upset McHugh's convictions on the misapplication counts.14

13. Certainly, it is reasonable to infer from this that
McHugh thought the Board might not approve of these loans.

14. Relying on a passage in Gens where we took note of a

category of cases in which the defendant officials had
"assured the named debtor, regardless of his financial
capabilities, that they would look for repayment only to the
third party who actually received the loan proceeds[,]" see

Gens, 493 F.2d at 222, McHugh also argues that because he

neither made this type of assurance nor adopted any such
assurance made by Brennan to a nominal debtor, his
convictions cannot stand. The short answer to McHugh's
argument is that, in making this statement in Gens, we were

-12-
12

B. Pretrial and Trial Issues

As we have stated, McHugh and Brennan raise a

number of challenges to decisions the district court made

regarding the parameters of the trial, the admissibility of

certain evidence, and the jury instructions. We discuss each

argument in turn.

1. Severance

McHugh contends that the district court committed

reversible error in denying his motion for severance. More

particularly, McHugh asserts (1) that the number of counts in

the indictment created jury confusion; (2) that there was a

prejudicial spillover of evidence, particularly "Rule 404(b)

evidence,"15 that was admitted solely against Brennan; and

not setting forth the elements of the offense of
misapplication. Instead, we were summarizing those instances
where bank officials had been found guilty of willful
misapplication for making loans while aware that the proceeds
would be passed along to third parties. See generally id. at

221-22.
Moreover, despite McHugh's assertion to the contrary, a
careful reading of the charge reveals that the trial judge
did not instruct the jury that the existence of one of the
two aforementioned types of assurances was an element of the
crime of willful misapplication. Rather, the court merely
informed the jury that if there had been one of these two
types of assurances, "misapplication may be found." Thus,
even if, as McHugh suggests, there was no evidence tending to
indicate either that he assured the named debtors that he
would look only to Brennan for repayment or that he had
adopted such an assurance made by Brennan, the absence of
this type of evidence would not mandate a reversal of his
convictions.

15. Fed. R. Evid. 404(b) provides:

-13-
13

(3) that the defendants were asserting such inconsistent

defenses that severance was warranted. We do not agree.

A trial court will grant severance "only upon a

strong showing of prejudice." E.g., United States v. Tejeda,

974 F.2d 210, 219 (1st Cir. 1992). A district court's denial

of a motion for relief from prejudicial joinder, see Fed. R.

Crim. P. 14,16 is reviewed only for an abuse of discretion,

e.g., United States v. Tracy, No. 92-1459, slip op. at 8 (1st

Cir.), cert. denied U.S. , 61 U.S.L.W. 3773 (1993),

and we will reverse only if the district court's decision

"`deprived defendant of a fair trial, resulting in a

miscarriage of justice.'" Tejeda, 974 F.2d at 219 (quoting

United States v. McLaughlin, 957 F.2d 12, 18 (1st Cir.

1992)).

Other crimes, wrongs, or acts. Evidence of
Other crimes, wrongs, or acts.
other crimes, wrongs, or acts is not admissible to
prove the character of a person in order to show
action in conformity therewith. It may, however,
be admissible for other purposes, such as proof of
motive, opportunity, intent, preparation, plan,
knowledge, identity, or absence of mistake or
accident, provided that upon request by the
accused, the prosecution in a criminal case shall
provide reasonable notice in advance of trial, or
during trial if the court excuses pretrial notice
on good cause shown, of the general nature of any
such evidence it intends to introduce at trial.

16. In relevant part, Fed. R. Crim P. 14 states: "If it
appears that a defendant . . . is prejudiced by a joinder of
offenses or of defendants in an indictment . . ., the court
may order an election or separate trials of counts, grant a
severance of defendants or provide whatever other relief
justice requires. . . ."

-14-
14

Briefly stated, we can perceive no abuse of

discretion resulting in a miscarriage of justice here.

Although this was a complicated case, McHugh has provided us

with absolutely no basis for concluding that the jury was

confused. Rather, the discriminating verdict suggests to us

that the jury was fully able to follow the court's

instructions and differentiate between the counts and

defendants. See United States v. Boylan, 898 F.2d 230, 246

(1st Cir.), cert. denied, 498 U.S. 849 (1990). Moreover, we

are persuaded that the district court's vigilant and

persistent use of limiting instructions throughout the trial,

when taken with its final charge instructing the jury to

consider the defendants and the counts separately, adequately

protected McHugh from the possible effects of prejudicial

spillover. See Tejeda, 974 F.2d at 219.17 Finally, to the

17. With regard to each of the examples (i.e., the

promissory notes to Gloria Campobasso and the Hokal Anstalt,
the complaint filed by Judith Eissner, and the testimony of
Kenneth D'Amato regarding two conversations with Brennan
wherein Brennan stated that McHugh would someday wake up and
find a new car in his driveway) McHugh cites where the
district court did not deliver a limiting instruction despite
McHugh's request for one, we note that the district court
explicitly denied McHugh's request because, in its view, the
evidence was probative on the question of whether there was a
conspiracy between McHugh and Brennan. On appeal, McHugh
does not challenge the correctness of this ruling.
Accordingly, this evidence, far from being prejudicial
because of its potential for "spilling over," must be
construed as evidence properly admitted against McHugh on the
conspiracy count.
With regard to the evidence admitted only against
Brennan but referred to by the Government in its closing
argument against McHugh, we simply note that McHugh did not

-15-
15

extent that McHugh raised any defenses that were inconsistent

with the ones presented by Brennan, McHugh has not

articulated, nor can we discern, how the inconsistencies were

"so prejudicial and the defenses so irreconcilable that the

jury unjustifiably . . . infer[red] that this conflict alone

demonstrates that both are guilty." United States v. Luciano

Pacheco, 794 F.2d 7, 8 (1st Cir. 1986) (quoting United States

v. Bautista, 731 F.2d 97, 100 (1st Cir. 1984)). Accordingly,

we find that the district court did not abuse its discretion

in refusing to grant McHugh's severance motion.

2. Evidence Relating to Brennan's Dealings with Other

Banks and Persons

Brennan generally argues that "the Government was

permitted to introduce excessive evidence relating to other

transactions that were not a basis for the indictment." He

goes on, however, to specify only three examples of such

"excessive" evidence: (1) the testimony of Gloria Campobasso

regarding an outstanding promissory note Brennan had given

object to the Government's line of argument at that time.
Accordingly, we review only for plain error. United States

v. Gonzales-Torres, 980 F.2d 788, 791 (1st Cir. 1992). To

establish plain error, McHugh must demonstrate that the error
complained of is so compelling that he virtually is assured
of succeeding in his appeal, and that the error affected the
fundamental fairness and basic integrity of the proceedings
in the lower court. See id.; see also Boylan, 898 F.2d at

249 ("The [plain error] doctrine does not allow litigants to
be relieved from the `ordinary backfires . . . which may mar
a trial record.'") (quoting United States v. Griffin, 818

F.2d 97, 100 (1st Cir.), cert. denied, 484 U.S. 844 (1987)).

We find that the incident at issue, if erroneous, falls far
short of the plain error threshold.

-16-
16

her, (2) the testimony of Donald Moscone regarding an

outstanding promissory note Brennan had given him, and (3)

the testimony of K. Dun Gifford regarding a certain loan he

had taken out at the First American Bank on Brennan's behalf.

At trial, Brennan neither objected to the introduction of any

of this evidence nor did he request a limiting instruction.

Thus, the admission of this evidence can serve as a basis for

reversal only if plainly erroneous. Gonzales-Torres, 980

F.2d at 791. After carefully reviewing the entire record, we

discern no plain error in the district court's admission of

this evidence. Accordingly, we reject Brennan's argument for

reversal on this ground.18

3. Gifford's Testimony Characterizing Brennan's Actions

Towards Him as "Illegal, Unlawful and Fraudulent"

Brennan's next argument, that K. Dun Gifford's

testimony that Brennan's dealings with him were "illegal,

unlawful and fraudulent" prejudiced him, suffers a similar

18. Without elaborating, McHugh also states that the
admission of the above-referenced evidence without limiting
instructions "was highly prejudicial" to him. However, he
neither identifies a specific instance where he was denied a
limiting instruction nor attempts to explain why the
admission of this evidence was highly prejudicial.
Accordingly, we view McHugh's "argument," to the extent that
it can be so characterized, as waived. See, e.g., Cohen v.

Brown Univ., No. 92-2483, slip op. at 30 (1st Cir. April 16,

1993) ("Litigants cannot preserve an issue for appeal by
raising a pennant and then moving on to another subject.");
Ryan v. Royal Ins. Co. of America, 916 F.2d 731, 734 (1st

Cir. 1990) ("[I]ssues adverted to on appeal in a perfunctory
manner, unaccompanied by some developed argumentation, are
deemed to have been abandoned.").

-17-
17

fate. Even if we construe the admission of this statement as

erroneous, Brennan's failure to object to it at trial limits

our review to the now-familiar plain error rubric. Id. Once

again, our review persuades us that the district court's

admission of this evidence did not rise to the level of plain

error. Accordingly, we decline to reverse on this ground.

4. Prosecutorial Misconduct
4. Prosecutorial Misconduct

Brennan makes two separate arguments that

prosecutorial misconduct requires a reversal of his

conviction. He first claims that he is entitled to a new

trial because the prosecutor asked him on cross-examination,

without a good faith basis for the question, whether he was

terminated from prior employment as a stockbroker at Tucker,

Anthony, and Day. The record reveals, however, that George

Downey and Brian O'Rourke, who were interviewed by the

Federal Bureau of Investigation prior to trial, stated to the

interviewing agents that Brennan had been terminated from his

employment at Tucker, Anthony, and Day for unauthorized

trading. Brennan has not presented us with any evidence

suggesting that the Government knew, or should have known,

that these statements were false. Accordingly, there is no

reason for us to conclude that the question posed to Brennan

on cross-examination was not asked in good faith.19

19. Brennan also argues, in a paragraph that can most
charitably be described as cryptic, that one of the
Government prosecutors made false representations to the

-18-
18

Second, Brennan contends that the Government acted

improperly in putting into issue, both in its cross-

examination of Brennan and in its rebuttal argument, the fact

that Brennan did not introduce into evidence any records

corroborating certain aspects of his testimony. In Brennan's

view, such actions apparently were tantamount to making a

comment on Brennan's failure to testify and thereby shifted

the burden of proof from the Government to Brennan. Again,

we do not agree.

Without question, clearly it is impermissible for a

prosecutor to comment, either directly or by implication, on

a defendant's failure to take the stand during a trial.

Griffin v. California, 380 U.S. 609, 615 (1965). However,

when a defendant does take the stand, a prosecutor may attack

district court at the sidebar conference during which the
court addressed whether the Government could inquire into the
circumstances surrounding Brennan's departure from Tucker,
Anthony, and Day. In so doing, however, Brennan relies upon
an affidavit which is not part of the record before us, has
not been made part of any appendix (as no appendix was
submitted by appellants), and was not included in his inutile
addendum. Accordingly, we do not address this argument. See

Commonwealth of Massachusetts, Dep't. of Pub. Welfare v.

Secretary of Agric., 984 F.2d 514, 522-23 n.7 (1st Cir. 1993)

(appellant who shirks his/her duty "to provide this court
with an appendix sufficient to support his[/her] points on
appeal" must bear the onus of any insufficiencies in the
appellate record) (quoting United States v. One Motor Yacht

Named Mercury, 527 F.2d 1112, 1113 (1st Cir. 1975)).

Furthermore, we admonish Brennan's appellate counsel for his
lack of professionalism in characterizing the Government's
prosecutor's statements as "false," "fictitious," and
"unconscionable" without providing us with even a scintilla
of evidence to support his allegations.

-19-
19

as weak the evidentiary foundation upon which a defendant's

testimony rests. See United States v. Garcia, 818 F.2d 136,

143-44 (1st Cir. 1987); United States v. Savarese, 649 F.2d

83, 87 (1st Cir. 1981). Moreover, we previously have held

that a prosecutor's comments regarding a defendant's failure

to produce documents corroborating a defense theory are

proper if they are limited to assailing the strength or

plausibility of the proffered theory. See United States v.

Glantz, 810 F.2d 316, 321-22 (1st Cir.), cert. denied, 482

U.S. 929 (1987).

Having reviewed the questions and comments at issue

here,20 we are persuaded that they were made solely for the

purpose of calling into question the strength and

plausibility of certain of Brennan's testimony. Moreover, we

20. On direct, Brennan testified about a number of
transactions and facts that normally would have been
memorialized in writing during the ordinary course of
business dealings. On cross-examination, after ascertaining
that Brennan had reviewed the records of these transactions
and facts prior to trial, the Government asked Brennan: "And
some of those documents, I imagine, would corroborate what
you have been saying on the stand for the last two days, is
that right?" Later, in its rebuttal argument, the Government
made the following comment:

Then you have the suggestion that you should
take Mr. Brennan at his word that he had $700,000
in the bank. Well, first of all, ladies and
gentlemen, I suggest that you have no reason based
on his testimony, based on the evidence, to take
him at his word.
You may ask yourselves the question: Where is
the bank statement? Where is the thing produced?
Who corroborates his testimony?

-20-
20

are convinced that the jury could not have drawn an improper

inference from them. Accordingly, we reject Brennan's

request for a new trial insofar as it is based upon these

questions and comments.

5. Deposition Testimony of Non-Testifying Codefendant

Brennan also argues that the district court's

admission against him, pursuant to Fed. R. Evid.

801(d)(2),21 of certain deposition testimony given by the

non-testifying McHugh during the course of a civil case in

1989 entitles him to a new trial.22 In Brennan's view, the

admission of this material infringed on his Sixth Amendment

right to conduct adequate cross-examination of an adverse

witness and resulted in reversible error. We do not share

Brennan's belief that reversible error was committed.

As an initial matter, we agree with Brennan that

because the disputed deposition testimony was not given

"during the course and in furtherance of the conspiracy," it

was not admissible under Fed. R. Evid. 801(d)(2)(E). See

21. Although it did not so specify, it is apparent that the
court admitted the statement as "a statement by a
coconspirator of a party during the course and in furtherance
of the conspiracy." See Fed. R. Evid. 801(d)(2)(E).

22. During McHugh's cross-examination of Brennan, Brennan
represented that, at the time he had requested two of the
loans applied for at CSB, he told McHugh the reasons he
needed the loans. In response, the Government, during its
cross-examination of Brennan, successfully sought to
introduce the prior testimony of McHugh that he did not know
the purposes of the loans at issue at the time Brennan
applied for them.

-21-
21

United States v. Carper, 942 F.2d 1298, 1301 (8th Cir.)

(statement made to officer after arrest of coconspirator not

admissible under Fed. R. Evid. 801(d)(2)(E) because it was

not made in furtherance of conspiracy), cert. denied,

U.S. , 112 S. Ct. 614 (1991). However, even if we

construe the admission of the statement as erroneous, our

review of the entire record persuades us that the error was

harmless beyond a reasonable doubt.23 See Chapman v.

California, 386 U.S. 18, 22-24 (1967); Manocchio v. Moran,

919 F.2d 770, 783-84 (1st Cir. 1990) (subjecting material

which creates Sixth Amendment Confrontation Clause problems

to harmless error analysis), cert. denied, U.S. , 111

S. Ct. 1695 (1991); see also Carper, 942 F.2d at 1301-02

(admission of statement to officer under Fed. R. Evid.

801(d)(2)(E) held to be harmless error).

Simply put, we do not believe, as Brennan contends,

that McHugh's testimony tended to prove that "Brennan was

fabricating the purposes of the loans." McHugh's deposition

testimony was that McHugh did not know why Brennan was

seeking the loans; it was not that Brennan provided him with

false purposes for the loans. Thus, the testimony had

little, if any, probative value. This fact, when coupled

23. On appeal, the Government makes a somewhat strained
argument that the material was admissible under Fed. R. Evid.
806. Because we find that the admission of this material, if
erroneous, was harmless error, we need not reach the merits
of the Government's position.

-22-
22

with the abundance of evidence, completely independent of the

material here at issue, to support each of Brennan's

convictions, convinces us beyond a reasonable doubt that the

jury "would have reached the same verdict without having

received the tainted evidence." Clark v. Moran, 942 F.2d 24,

27 (1st Cir. 1991) (quoting Milton v. Wainwright, 407 U.S.

371, 377 (1972)); see also United States v. Hudson, 970 F.2d

948, 953-54 (1st Cir. 1992) (overwhelming independent

evidence of guilt renders erroneous failure to admit certain

exculpatory evidence harmless error). Accordingly, we

decline Brennan's request for a new trial insofar as it is

premised on the allegedly erroneous admission of the McHugh

deposition testimony.

6. Jury Instructions

McHugh contends that, in three respects, the

district court committed reversible error in its jury

instructions. After carefully reviewing the record in light

of McHugh's arguments, we do not agree.

a. Ratification of Board as a Defense

McHugh argues that the court erred in refusing to

instruct the jury that ratification by the Board constitutes

a complete defense to willful misapplication. In so doing,

McHugh refers us to several cases which, without analysis,

simply state that valid consent or ratification by the Board

-23-
23

of Directors is a defense to a charge of misapplication.

See, e.g., United States v. Gregory, 730 F.2d 692, 701 (11th

Cir. 1984), cert. denied, 469 U.S. 1208 (1985); United States

v. Beran, 546 F.2d 1316, 1321 (8th Cir. 1976), cert. denied,

430 U.S. 916 (1977).

In contrast, courts which recently have had

occasion to address the issue specifically have concluded

that, absent special circumstances, "knowledge, ratification

and consent [of the Board] are not per se defenses to the

charge [of willful misapplication]." United States v.

Cauble, 706 F.2d 1322, 1353 (5th Cir. 1983) cert. denied, 465

U.S. 1005 (1984); see generally Villa, Banking Crimes,

3.02[5][c]; accord United States v. Bailey, 859 F.2d 1265,

1279 (7th Cir. 1988), cert. denied, 488 U.S. 1010 (1989);

United States v. Castro, 837 F.2d 441, 442 (11th Cir.

1988).24 Instead, they have determined that knowledge,

ratification, and consent "are evidentiary matters that may

be considered as part of the defense that there was either

not willful misapplication or not intent to injure the bank."

Cauble, 706 F.2d at 1353; see also United States v. Castro,

24. Of course, there may be peculiar circumstances where a
finding of ratification by the Board would, per se, compel

the defendant's acquittal. If, for example, the charge of
willful misapplication were premised entirely upon a bank
officer's non-disclosure of a loan to the Board, clearly a
jury could not convict that officer of misapplication if it
found that s/he had presented the loan to the Board and the
Board had ratified it.

-24-
24

887 F.2d 988, 995 (9th Cir. 1989). We are in full agreement

with the rule established by these courts.

In our view, the correctness of this recent line of

authority is best demonstrated by a brief explication of the

practical effects of its negation. If we were to adopt the

absolute rule proposed by McHugh and hold that ratification

by a Board of Directors per se exonerates a bank officer from

charges of willful misapplication, then we would, for

example, put beyond the reach of 656 a bank officer who, in

collusion with a rogue Board, provides bank funds to an

otherwise unqualified personal friend. We simply cannot

discern any rational justification for reaching such a

result.

In the instant matter, the district court declined

to instruct the jury that, as a matter of law, it could not

convict McHugh of misapplication if it found that the Board

had ratified the loans at issue. Instead, the court allowed

McHugh to introduce evidence of ratification and to argue

that this evidence suggested that McHugh had no intent to

injure or defraud CSB. We believe that, in this case, the

court's actions were entirely appropriate. Accordingly, we

reject McHugh's claim of reversible error.

b. Reference to False Entries in Overt Act Instructions

McHugh next contends that because the district

court entered a judgment of acquittal notwithstanding the

-25-
25

verdict for McHugh on the false entry counts, it was

reversible error for it to have allowed the jury to consider

the incident underlying one of the false entries counts as an

overt act in its conspiracy instruction. The error, in

McHugh's view, arises from the fact that "the jury may have

found [McHugh] guilty of conspiracy solely on the basis of an

alleged act which was not criminal." However, it is well

established that an overt act need not be a crime. Yates v.

United States, 354 U.S. 298, 334 (1957), overruled on other

grounds, Burks v. United States, 437 U.S. 1 (1978); see also

United States v. Medina, 761 F.2d 12, 15 (1st Cir. 1985).

Accordingly, McHugh's argument, limited as it is to the

statement quoted above, fails as a matter of well-

established law.

c. Loan Authority Instruction

McHugh also takes issue with the district court's

having instructed the jury: "In addition, with regard to

these charges, you may also consider the evidence concerning

Mr. McHugh's loan authority and question whether he acted

with intent to injure [the CSB] in his dealings with Mr.

Brennan." It is McHugh's opinion that this instruction

improperly "focused the attention of the jury on resolution

of one evidentiary issue as especially significant in their

[sic] deliberations [concerning] whether [McHugh] acted with

intent to injure and defraud." Our review of the record,

-26-
26

however, persuades us that this instruction, far from being

faulty, was an altogether proper exercise by the district

judge of his authority to "assist the jury in arriving at a

just conclusion by explaining and commenting upon the

evidence, [and] by drawing their [sic] attention to the parts

of it which he thinks important[.]" Querica v. United

States, 289 U.S. 466, 469 (1933). Accordingly, we reject

McHugh's characterization of this instruction as erroneous.

C. Miscellany

Brennan raises three final arguments. First, he

asserts that his representation at trial and at sentencing

was constitutionally deficient. Next, he contends that the

district court abused its discretion in sentencing him to the

high end of the relevant guideline range. Finally, he

maintains that the court abused its discretion in adjusting

his sentence upward for obstruction of justice. None of

Brennan's arguments requires extended discussion.

1. Ineffective Assistance

Brennan claims that his representation at trial and

at sentencing was ineffective and violated his Sixth

Amendment rights. In so doing, Brennan points primarily to

the failure of trial counsel to introduce certain documents

into evidence and the failure of sentencing counsel to spend

sufficient time preparing for the sentencing hearing.

However, the appellate record does not indicate that either

-27-
27

of these claims was properly raised before and/or addressed

by the district court. Moreover, our review of the record

persuades us that the record is not sufficiently developed

for us to address the merits of Brennan's Sixth Amendment

claim at this time. Accordingly, we do not reach it. See,

e.g., United States v. Gray, 958 F.2d 9, 15 (1st Cir. 1992)

("Time and again we have held that a claim of inadequate

representation will not be resolved on direct appeal when the

claim has not been raised in the district court, unless the

critical facts are not in dispute and a sufficiently

developed record exists."); see also United States v. Hoyos-

Medina, 878 F.2d 21, 22 (1st Cir. 1989) ("Fairness to the

parties and judicial economy both warrant that, absent

extraordinary circumstances, an appellate court will not

consider an ineffective assistance claim where no endeavor

was first made to determine the claim at the district court

level.").25

2. Sentence at High End of Guidelines Range

Brennan also contends that the district court

abused its discretion in sentencing him to the high end of

the relevant guideline range while departing downward in

sentencing McHugh. The thrust of Brennan's argument is that

the disparity between the sentences of McHugh and himself is

25. Brennan may, of course, press his ineffective assistance
claim in the district court by way of a collateral proceeding
under 28 U.S.C. 2255.

-28-
28

unfair. Established caselaw, however, makes clear that we

have no jurisdiction to review a sentence that is within the

applicable guideline range. E.g., United States v. Aubin,

961 F.2d 980, 984 (1st Cir.), cert. denied, 113 S. Ct. 248

(1992). Accordingly, we do not reach the merits of Brennan's

argument.26

3. Enhancement for Obstruction of Justice

Finally, Brennan asserts that the district court

abused its discretion by enhancing his sentence two levels

for obstruction of justice for perceived perjurious

testimony. See U.S.S.G. 3C1.1 ("If the defendant willfully

obstructed or impeded, or attempted to obstruct or impede,

the administration of justice during the investigation,

prosecution, or sentencing of the instant offense, increase

the offense level by 2 levels.") (1991 version). A district
2

court's application of this guideline provision is reviewable

only for clear error. E.g., United States v. Batista-

Polanco, 927 F.2d 14, 22 (1st Cir. 1991). Our review

convinces us that the district court's application of

U.S.S.G. 3C1.1, far from being clearly erroneous, is amply

26. In his reply brief, Brennan also challenges the district
court's calculation of loss. As noted above, see supra note

7, arguments made for the first time in an appellant's reply
brief are deemed waived. See Rivera-Muriente, 959 F.2d at

354. Thus, we do not address Brennan's loss calculation
challenge.

-29-
29

supported by the record.27 Accordingly, we reject

Brennan's claim that the enhancement at issue was an abuse of

discretion.

III.

CONCLUSION

Having rejected each of the arguments made on

appeal by Brennan and McHugh, we affirm their convictions and

sentences.

Affirmed.

27. The district court explicitly found each of the
following to be examples of Brennan's perjurious testimony:
(1) Brennan's claim that he did not submit a PFS for purposes
of influencing CSB's decision to provide him with the June 5,
1987, $70,000 loan; (2) Brennan's assertion that he expected
all of his bounced checks to be honored because he expected
there to be sufficient funds in the appropriate accounts at
the time the checks were presented for payment; and (3)
Brennan's statement that he did not acknowledge having any
notes payable to others on his PFS because of sufficient
"offsetting assets." There was overwhelming evidence to
support each of these findings.

-30-
30